# UNITED STATES DISTRICT COURT
# DISTRICT OF NEW JERSEY

| | |
|---|---|
| **TOWNSHIP OF LAKEWOOD**, *et al.*, <br><br>     **Plaintiffs,** <br><br>   v. <br><br> **JULIAN CASTRO, Secretary, United States Department of Housing and Urban Development,**[1] <br><br>     **Defendant.** | Case No. 15–cv–06325–ESK–SAK <br><br><br> **OPINION** |

**KIEL, U.S.D.J.**

After a decade of protracted litigation, the parties come before the Court seeking to resolve a single issue. Is plaintiff Lakewood Tenants Organization, Inc. (LTO) a public housing agency as defined in the Housing Act? I conclude that—because LTO has administered co-plaintiff Township of Lakewood's (Lakewood) Section 8 program for nearly 50 years—it is. The consequence of this determination and plaintiffs' allegations of bias and selective enforcement are for another day and another decision. Accordingly, HUD's motion for a determination that LTO is a public housing agency (HUD Mot.) will be granted.

---

[1] Julian Castro served as the Secretary of the United States Department of Housing and Urban Development (HUD) at the time the amended complaint was filed. (ECF No. 30.) Adrianne Todman served in that role at the time of the pending motion. (ECF No. 204 (HUD Mot.).) Scott Turner now serves as HUD Secretary. HUD's Secretary, U.S. Dep't of Hous. and Urb. Dev., https://www.hud.gov/aboutus/secretary (last visited Jan. 20, 2026). Turner is substituted as defendant pursuant to Federal Rule of Civil Procedure 25(d), which provides that a public officer is automatically substituted by their successor when they cease to hold office. *See* Fed. R. Civ. P. 25(d); *Spence v. Foxx*, 159 F. Supp. 3d 483, 487 n.1 (D.N.J. 2014) (substituting the former Secretary of Transportation with his successor).

## I. BACKGROUND

The procedural and factual history of this case is long and complex. The question presented is narrow. The Court presumes the parties' familiarity with the underlying facts of this case and references them only as necessary to resolve the limited pending issue.

### A. The Amended Complaint

#### 1. Lakewood's Section 8 Program

Lakewood is a municipality created by the New Jersey Legislature in March 1892. (ECF No. 30 p. 7.) Relevant to the amended complaint, but not necessarily the pending motion, Lakewood is home to a large Orthodox Jewish population. (*Id.*) Section 8 of the Housing Act includes the Housing Choice Voucher Program in which HUD enters into annual contributions contracts with public housing agencies. (*Id.* p. 9.) The public housing agencies in turn enter into contracts with dwelling owners for the purpose of having units rented to low-income families with a portion of the rental payments provided by the federal government. (*Id.*)

LTO is a nonprofit corporation founded in 1970 to serve Lakewood renters. (*Id.* pp. 7, 9, 10.) In 1977, HUD requested that Lakewood participate in the Housing Choice Voucher Program and Lakewood and HUD entered into an annual contributions contract. (*Id.* p. 9.) That same year, Lakewood and LTO entered into a contract to administer Lakewood's Housing Choice Voucher Program—known as the Lakewood Township Residential Assistance Program (LTRAP)—with LTO serving as an independent contractor. (*Id.* pp. 2, 9.) Lakewood and LTO sought HUD approval of their contract in August 1977, but HUD responded that its approval was not required. (*Id.* p. 10.) Contracts between HUD and Lakewood and Lakewood and LTO have continued while LTRAP expanded from 80 to 1,140 units. (*Id.*) Each year, Congress establishes the administrative fees deemed reasonable and necessary to

2

manage Section 8 programs and Lakewood and LTO's contract sets out that LTO will perform all management and administrative functions and receive the full fee in return. (*Id.*) This course has continued for decades with HUD's knowledge, including in the submission of contracts and financial statements. (*Id.* pp. 10, 11.)

### 2. Mr. N and Initial Investigations

LTO was notified on August 31, 2011 that a tenant—referred to in the amended complaint as "Mr. N"—was simultaneously collecting subsidies from LTO and another entity. (*Id.* p. 11.) Following an investigation, LTO notified Mr. N that his LTRAP voucher had expired, consistent with HUD procedures in which the more recent of two subsidies is discontinued in like instances. (*Id.* pp. 11, 12.) In an apparent response, HUD sent a letter to LTO on November 28, 2011 expressing concern about LTRAP's success rate in issuing vouchers and demanding production of information, to which LTO complied. (*Id.* p. 12.)

Mr. N filed a formal housing discrimination complaint with HUD on August 8, 2012. (*Id.* p. 13.) LTO responded to the complaint and cooperated during HUD's eight-month investigation. (*Id.*) LTO also responded to Mr. N's amended complaint filed in early 2013. (*Id.* pp. 13, 14.) Approximately 15 HUD agents conducted an onsite investigation at LTO offices on May 29 and 30, 2013 during which nine of LTO's 18 employees were questioned. (*Id.* p. 14.) During the questioning, which the amended complaint characterizes as "[i]nterrogations," HUD officials allegedly made antisemitic remarks and questioned LTO employees about their religious observances. (*Id.* pp. 14, 27, 28.) The general implication was that LTO personnel were untrustworthy due to their faith. (*Id.* pp. 14, 28.)

HUD officials demanded Mr. N's reinstatement, to which LTO refused, and LTO's counsel requested either a written demand from HUD Newark's Fair Housing and Equal Opportunity (FHEO) Division or a written directive from

HUD Newark's Public and Indian Housing Management Division. (*Id.* p. 15.) No written demand or directive were issued. (*Id.*) On June 3, 2013, the FHEO enforcement chief wrote to LTO's counsel demanding additional document productions, the contents of LTO's Section 8 participant and waiting-list files, a list of office holidays, and a list of LTO board members from 2010 on including name, race, national origin, sex, and disability status. (*Id.*) The letter also advised that HUD would require another two-day onsite visit to interview remaining staff and review additional documents. (*Id.* p. 16.)

LTO's counsel responded in a June 12, 2013 letter that Mr. N's complaint did not justify HUD's demands. (*Id.*) On August 23, 2013, HUD's Fair Housing Region II director notified LTO that HUD was launching a compliance review to determine whether LTO was compliant with Title IV, Section 504 of the Rehabilitation Act, and the Americans with Disabilities Act. (*Id.* pp. 16, 17.) The August 23, 2013 letter also made additional information requests and notified LTO that HUD would conduct another onsite inspection with additional documents to be reviewed. (*Id.* pp. 17, 18.)

### 3. Further Investigation into LTO Practices

Plaintiffs allege that HUD's investigations went beyond the Mr. N complaints and into internal practices that are relevant to the instant motion. (*See id.* pp. 19–27.) Pursuant to LTO's contract with Lakewood, LTO is compensated at the administrative fee set by Congress. (*Id.* p. 19.) Public housing agencies are required to establish reserve accounts for when administrative fees exceed costs to cover subsequent shortfalls. (*Id.* p. 21.) Lakewood never has a surplus or deficit because its cost is the fee established by Congress. (*Id.*) In an August 9, 2011 email to LTO, HUD confirmed that reserve accounts—known as unrestricted net positions—should be reported as zero. (*Id.*) Further, the administrative fees paid from public housing

4

agencies to subcontractors have long been recognized as "defederalized" once paid and are thus no longer subject to audit. (*Id.* p. 22.) HUD had not sought to audit LTO's internal books from 1977 to 2013, but rather reviewed LTRAP's books, ledgers, and other records. (*Id.* p. 23.)

In a July 25, 2013 email, HUD stated that it would conduct an onsite financial management review designed to validate balances maintained in LTO's reserve accounts. (*Id.*) The onsite review took place over two days in September 2013. (*Id.* p. 24.) LTO addressed HUD's concerns with the exception of HUD's interest in investigating LTO's unrestricted net position through an onsite audit. (*Id.* p. 25.) As HUD's efforts continued, LTO sought the opinions of legal and accounting professionals, all of whom allegedly agreed that funds become defederalized once paid from the public housing agency to the subcontractor. (*Id.* p. 26.) HUD, further, may not audit or regulate the accounts of subcontractors. (*Id.*)

### 4. **HUD's Threatened Termination of LTRAP**

In a December 5, 2014 letter, HUD threatened to terminate the contract for LTRAP if LTO failed to submit to an audit of its internal books and records. (*Id.* p. 27.) Plaintiffs' counsel met with HUD representatives by telephone on February 10, 2015 and understood that HUD and plaintiffs would work toward a resolution. (*Id.* p. 28.) This understanding was memorialized in an email from plaintiffs' counsel to HUD's counsel dated February 17, 2015. (*Id.* p. 29.)

Nonetheless, on August 7, 2015, Lakewood's mayor was contacted by the field office director of HUD's Newark office and advised that HUD would be transferring Lakewood's program to the Lakewood Housing Authority. (*Id.*) A termination letter, dated August 11, 2015, stated that Lakewood was in default of its annual contributions contract. (*Id.* pp. 29, 30.) As a result of the default, HUD was to take control of LTRAP and transfer it to the Lakewood

5

Housing Authority effective September 1, 2015. (*Id.* p. 30.) The letter sought to terminate Lakewood's rights under the annual contributions contract and—by extension—terminate LTO's rights under the subcontract and affect participating LTRAP beneficiaries and landlords. (*Id.*) In a separate letter dated August 12, 2015, HUD Newark's director of the Office of Public Housing demanded the transfer of all current and historic program documents to the Lakewood Housing Authority. (*Id.*)

Plaintiffs allege that the Lakewood Housing Authority—whose executive director is not Jewish—possesses an inferior record as compared to LTRAP. (*Id.* p. 31.) Shutting down LTRAP and transferring the program to the Lakewood Housing Authority would be an injustice fueled by antisemitism, according to plaintiffs. (*Id.* p. 32.)

### B. **Procedural History**

Plaintiffs filed suit on August 21, 2015, alleging violation of due process and equal protection. (ECF No. 1.) Soon after, plaintiffs moved for an order to show cause preventing HUD from terminating LTRAP. (ECF No. 4.) On August 28, 2015, District Judge Michael A. Shipp signed a stipulation and consent order whereby the parties agreed to maintain "the status quo until the Court issues a final order on the Parties' cross[-]motions for summary judgment." (ECF No. 10 (Aug. 28, 2015 Order) pp. 3, 4.) An expedited schedule for cross-motions for summary judgment was to be completed within 120 days. (*Id.* p. 4.) The consent order also stated that HUD had agreed not to seek to take possession of LTRAP or otherwise act pursuant to its August 11, 2015 asserted findings of Lakewood's alleged breach of the annual contributions contract until after the cross-motions were decided. (*Id.* p. 2.) The parties acknowledged the Court's authority to adjudicate all matters at issue. (*Id.* p. 1.)

6

HUD answered (ECF No. 13) and moved to preclude discovery beyond the administrative record (ECF No. 18). The motion was adjourned multiple times (ECF No. 20; ECF No. 22; ECF No. 25) before ultimately being administratively terminated by Magistrate Judge Douglas E. Arpert (Ret.) on February 18, 2016 (ECF No. 27). The operative amended complaint followed on April 8, 2016, in which plaintiffs again asserted claims of breach of contract and violations of due process, equal protection, and the Administrative Procedures Act and added a count for alleged violation of the Religious Freedom Restoration Act. (ECF No. 30 pp. 33–44.)

On November 25, 2020, HUD moved for an order clarifying the scope of the August 28, 2015 consent order or, alternatively, to vacate it pursuant to Federal Rule of Civil Procedure 60(b)(6). (ECF No. 132.) The motion was preceded by HUD's administrative enforcement action against Lakewood, LTO, and LTO's executive director asserting that the executive director's salary exceeded the regulatory limit. (ECF No. 132–1 p. 16.) HUD argued that the consent order contemplated summary judgment motion practice within 120 days and no such motions had been filed after five years. (*Id.* pp. 7, 8.) Further, the amended complaint's addition of new plaintiffs and allegations expanded the scope of the case beyond what was contemplated at the time of the order. (*Id.*) District Judge Brian R. Martinotti administratively terminated the motion in a July 13, 2021 order and directed HUD to request a stay of the administrative enforcement action. (ECF No. 159 (July 13, 2021 Order).)

The case proceeded on with discovery and related disputes. On March 28, 2024, the case was reassigned to me. (ECF No. 189.) Magistrate Judge Sharon A. King held a settlement conference with the parties on September 10, 2024 (ECF No. 199) followed by a status conference on September 24, 2024 (ECF No. 202). Following the status conference, Judge King entered an order in

which she stated that resolution of the issue of whether LTO is a public housing agency "would conserve judicial resources and serve the best interests [of] the parties." (ECF No. 203 (Sept. 25, 2024 Order).) Judge King set forth a briefing schedule for the contemplated motion and stayed discovery pending its adjudication. (*Id.*)

The pending motion followed (HUD Mot.), to which plaintiffs filed an opposition (ECF No. 207 (Pls.' Opp'n Br.)), HUD filed a reply (ECF No. 212 (HUD Reply Br.)), and plaintiffs filed a sur-reply (ECF No. 213 (Pls.' Sur-Reply Br.)).

## II. STANDARD AND PARTY ARGUMENTS

### A. The Housing Act

The Section 8 Housing Choice Voucher Program was created in 1974. *Hayes v. Harvey*, 903 F.3d 32, 36 (3d Cir. 2018). The program is funded by HUD and administered by local public housing agencies. *Id.* The tenant-based assistance offered by the program is implemented whereby a tenant family selects an eligible unit and the applicable public housing agency thereafter contracts with the property owner to make rental assistance payments. *Id.*

Status as a public housing agency is associated with HUD budget approval and a host of regulatory requirements. *Hargrove v. Pleasantville Hous. Auth.*, Case No. 19–01162, 2019 WL 6712308, at *4 (D.N.J. Dec. 10, 2019). Relevant to HUD's August 11, 2015 termination letter, these requirements include recordkeeping and HUD access to accounts and other records. *See* 24 C.F.R. § 982.158.

The instant dispute focuses on whether LTO is a public housing agency. The Housing Act defines a public housing agency as "any State, county, municipality, or other governmental entity or public body (or agency or instrumentality thereof) which is authorized to engage in or assist in the

development or operation of public housing, or a consortium of such entities or bodies as approved by the Secretary." 42 U.S.C. §1437a(b)(6)(A). For the purpose of a Section 8 tenant-based assistance program, public housing agency also includes

> any other public or private nonprofit entity that, upon the effective date under section 503(a) of the Quality Housing and Work Responsibility Act of 1998, was administering any program for tenant-based assistance under section 1437f of this title (as in effect before the effective date of such Act), pursuant to a contract with the Secretary or a public housing agency ….

*Id.* §1437a(b)(6)(B)(ii).

HUD regulations offer similar definitions of a public housing agency. 24 C.F.R. §982.4(b). These include "[a]ny State, county, municipality, or other governmental entity or public body which is authorized to administer the program (or an agency or instrumentality of such an entity)" and "[a]ny other public or private non-profit entity that was administering a Section 8 tenant-based assistance program pursuant to a contract with the contract administrator of such program (HUD or a [public housing agency]) on October 21, 1998." *Id.*

## B. Statutory Interpretation

HUD's motion requires the Court to interpret provisions of the Housing Act. Matters of statutory interpretation are questions of law. *LD Gelato LLC v. Hartford Underwriters Ins. Co., Inc.*, 676 F. Supp. 3d 317, 323 n.7 (D.N.J. 2023). Courts interpreting a statute must begin with its text. *Dorman v. Computer Credit, Inc.*, 154 F. Supp. 3d 126, 130 (D.N.J. 2015). "[W]hen the statutory language is clear and unambiguous, the legislature's intent is best divined by reference to the plain meaning of a statute." *Hirschfeld v. Beckerle*, 405 F. Supp. 3d 601, 607 (D.N.J. 2019) (quoting *Sery v. Fed. Bus. Centers, Inc.*, 365 F. App'x 396, 397 (3d Cir. 2010)). Courts look not only at the particular

language at issue, but the structure of the section and the design and objective of the statute. *See id.* "When 'the statute's language is plain,' the court's inquiry must end, as 'the sole function of the courts is to enforce it according to its terms.'" *Id.* (quoting *United States v. Ron Pair Enters., Inc.*, 489 U.S. 235, 241 (1989)).

### C. Party Arguments

#### 1. HUD

HUD first argues that LTO meets the definition of a public housing agency under 42 U.S.C. §1437a(b)(6)(B) and 24 C.F.R. §982.4(b) because it is a nonprofit entity that has been administering a Section 8 program pursuant to a contract with Lakewood since 1977. (ECF No. 204–1 pp. 14–16.) LTO also fits the definition of a public housing agency as an agency or instrumentality of Lakewood pursuant to 42 U.S.C. §1437a(b)(6)(A) and 24 C.F.R. §982.4(b), according to HUD. (*Id.* pp. 16–25.) Lakewood and LTO's contract states that LTO is the designated agency tasked with administering Lakewood's Section 8 program. (*Id.* pp 18, 19.) Letters and representations dating back to 1996 also support the position that LTO is an agency or instrumentality and HUD has understood LTO to be serving that function. (*Id.* pp. 20–23.)

In its reply, HUD argues that prior orders entered in this case do not preclude the Court from finding that LTO is a public housing agency. (HUD Reply Br. pp. 5–8.) Judge King requested the parties' briefing on the issue and HUD's compliance cannot be interpreted as bad faith. (*Id.* p. 7 n.1.) The Housing Act plainly includes in its definition of public housing agencies nonprofits that were administering a Section 8 program pursuant to a contract with a public housing agency as of October 21, 1998. (*Id.* p. 9.) LTO was not pressed into service, but rather designated itself as a public housing agency by way of its contract with Lakewood. (*Id.*) The regulations cited by plaintiffs do not address whether an entity may become a public housing agency by

10

operation of statute, do not set forth the process necessary to become a public housing agency, and are superseded by statute to the extent that they are inconsistent. (*Id.* pp.11, 12.) Plaintiffs' factual arguments are also to no avail, according to HUD. (*Id.* pp.13–15.) For instance, 42 U.S.C. §1437a(b)(6)(B) clearly provides that a public housing agency may be a nonprofit contracting with another public housing agency and the fact that HUD may not have sought to audit or declare other entities public housing agencies is irrelevant. (*Id.* p.13.)

## 2. **Plaintiffs**

Plaintiffs submit that the Court need not consider the substance of HUD's motion because multiple orders have already addressed the issue of whether LTO may be deemed a public housing agency. (Pls.' Opp'n Br. pp.8–13, 32–37.) These include the August 28, 2015 consent order maintaining the status quo that LTO not be considered a public housing agency and Judge Martinotti's July 13, 2021 order directing HUD to seek a stay in its administrative enforcement action. (*Id.* pp.9–13.) Consent orders have the effect of judgments, according to plaintiffs, and there is no reason to reconsider or set aside the cited orders. (*Id.* pp.32–37.)

On the merits, HUD's arguments as to the plain language of 42 U.S.C. §1437a and 24 C.F.R. §982.4 are misplaced, according to plaintiffs, because a law cannot be interpreted as automatically converting a private entity to a public one. (*Id.* pp.38–40.) The cited language is better understood as what entities *could* be public housing agencies as opposed to those that are. (*Id.*) At the very least, HUD's plain-language argument should be rejected because the language is not plain. (*Id.* p.41.) HUD's own Handbook sets forth a variety of submissions needed to become a public housing agency that would be unnecessary if an agency could automatically become one. (*Id.* pp.43, 44.) Plaintiffs add that the Housing Act prohibits the changing of the legal status of

11

a public housing agency and HUD's interpretation of 24 C.F.R. §982.4 is not entitled to deference due to the inconsistent positions it has taken. (*Id.* pp. 43–46.)

Plaintiffs, in their sur-reply, accuse HUD of side-stepping its status-quo argument and emphasize that the status quo is that LTO is not a public housing agency. (Pls.' Sur-Reply Br. p. 4.) HUD does not dispute that LTO has not been a public housing agency since 1977, HUD has approved of LTO's arrangement with Lakewood, and that status quo was disrupted in August 2015 when HUD sought to assert that LTO is a public housing agency—leading to this suit. (*Id.* pp. 4, 5.) The status quo is preserved by the parties' consent order and the arguments raised by HUD here were rejected by Judge Martinotti in his July 13, 2021 order. (*Id.* pp. 5, 6.) LTO and Lakewood's business arrangement did not change following the effective date of the Quality Housing and Work Responsibility Act of 1998 and HUD had not attempted to place public-housing-agency requirements on a subcontractor until its recent efforts directed at LTO in 2014. (*Id.* pp. 8–13.) HUD has "flip-flopped" in its position, according to plaintiffs, and ignored applicable regulations "to further its preordained agenda to shut down [Lakewood's] program." (*Id.* pp. 12–15.)

### III.  DISCUSSION

#### A.  <u>The Court's Prior Orders</u>

A district court may adjudicate whether an agreement between the parties, incorporated into an order, has been breached. *Jackson v. Seifried*, Case No. 20–17410, 2023 WL 4627815, at *10 (D.N.J. July 9, 2023)). The scope of a consent order is determined by examining the terms within its four corners. *Id.* Courts must limit themselves to the order's terms. *Id.*

A court's first objective in reviewing a consent order is to determine whether the instant dispute is unambiguously covered by the order's terms. *See Democratic Nat'l Comm. v. Republican Nat'l Comm.*, Case No. 81–03876,

2016 WL 6584915, at *12 (D.N.J. Nov. 5, 2016) (referring to consent decrees). The parties are bound by the objective meaning of the terms used and courts may not strain that meaning or impose other terms to reconcile the order with their own understanding of its purpose.  *See id.*

Against this backdrop, I conclude that the orders cited by plaintiffs do not serve as a bar to a finding that LTO is a public housing agency.  As an initial matter, the pending motion was not prompted by HUD.  Rather, it was Judge King who ordered HUD to "file a motion seeking a determination as to whether LTO is a [public housing agency]."  (Sept. 25, 2024 Order.)

More to the point, plaintiffs overstate the scope of the August 28, 2015 consent order and Judge Martinotti's July 13, 2021 order.  The consent order acknowledged that the Court could adjudicate all matters at issue.  (Aug. 28, 2015 Order p. 1.)  It also noted that HUD had agreed not to seek to take possession of LTRAP or "otherwise take any action based on HUD's August 11, 2015, asserted findings of the Township of Lakewood's breach of its Annual Contributions Contract" until the parties' cross-motions for summary judgment were ruled on.  (*Id.* p. 2.)  HUD does not seek to take possession of LTRAP as part of the instant motion and such relief will not be granted here.

Insofar as plaintiffs lean on the "otherwise take action" language in the order, the August 11, 2015 letter asserted HUD's authority to take possession of LTRAP based on its determination that Lakewood was in default of its annual contributions contract for failure to comply with recordkeeping and disclosure requirements.  (ECF No. 4–1 pp. 21–23.)  This determination was premised, in part, on HUD's earlier conclusion that Lakewood and LTO together constituted a public housing agency.  (*Id.* p. 22.)  Again, the instant motion does not seek—and I will not enter in response to the present motion—an order permitting HUD to take possession of LTRAP or otherwise act on its

13

position that Lakewood was in default and failed to comply with regulatory requirements.

Nowhere within the four corners of the consent order is HUD prevented from merely seeking a ruling that LTO is a public housing agency. *See Jackson*, 2023 WL 4627815, at *10. Nor is the position that LTO is not a public housing agency—as opposed to LTO's continued operation of LTRAP—unambiguously part of the status quo. Therefore, the consent order's terms do not "unambiguously cover the dispute in question." *Democratic Nat'l Comm.*, 2016 WL 6584915, at *12 (quoting *United States v. New Jersey*, 194 F.3d 426, 430 (3d Cir. 1999)).

Likewise, Judge Martinotti's July 13, 2021 order merely directed HUD to request a stay of its administrative enforcement action pending the resolution of this case. (July 13, 2021 Order.) HUD does not now ask, and I will not now order in response to the present motion, that the stay be lifted and for the administrative action to proceed.

Accordingly, a determination that LTO is a public housing agency does not disturb the status quo that has been in effect since the entry of the consent order. (Aug. 28, 2015 Order pp. 3, 4.) Whatever effect such a determination may have, HUD is prohibited from acting on it until the Court issues its order in response to the parties' contemplated cross-motions for summary judgment. (*Id.* p. 4.) In the meantime, LTO may continue operating as it has in the decade since the consent order was entered. A determination that LTO is a public housing agency no doubt would be adverse to plaintiffs' stated position and would impact the parties' summary judgment briefing. However, I agree with Judge King that determination of that issue will "conserve judicial resources and serve the best interests [of] the parties" from now to the resolution of the

case. (Sept. 25, 2024 Order.) I will thus advance to the merits of HUD's motion.[2]

## B. Public Housing Agencies

I turn to the statutory text and begin with 42 U.S.C. §1437a(b)(6)(B). As described above, §1437a(b)(6)(B) states that, for the purposes of the program for tenant-based assistance under Section 8, the term "public housing agency" includes three definitions. §1437a(b)(6)(B). Among them is "any other public or private nonprofit entity that, upon the effective date under section 503(a) of the Quality Housing and Work Responsibility Act of 1998, was administering any program for tenant-based assistance under section 1437f … pursuant to a contract with … a public housing agency." §1437a(b)(6)(B)(ii).

The common definition of the term "include" is "[t]o contain as a part of something." *Include, Black's Law Dictionary* (12th ed. 2024). The term "suggests that Congress intended to illustrate a broad concept rather than narrowly circumscribe a term with exclusive categories." *Singh-Kaur v. Ashcroft*, 385 F.3d 293, 298 (3d Cir. 2004) (referring to "including").

Clear enough. There is no dispute that LTO is a nonprofit entity that (1) administers Lakewood's Section 8 program and (2) has done so since 1977. (ECF No. 30 p. 2; ECF No. 204–12.) Lakewood itself is a public housing agency.

---

[2] Plaintiffs also refer to Judge Martinotti's opinion and order (ECF No. 65; ECF No. 66) denying HUD's motion for judgment on the pleadings (Pls.' Opp'n Br. p. 10). HUD argued as part of that motion that Lakewood, not LTO, was a public housing agency. (*Id.*) HUD has now "flip-flopped" its position, according to plaintiffs. (*Id.*) Plaintiffs do not cite to a specific argument then-made by HUD and HUD's motion brief supporting its motion for judgment on the pleadings cited an April 14, 2014 letter stating that LTO and Lakewood together constituted a public housing agency. (ECF No. 43–1 p. 11 n. 1) HUD contended that "the distinction between the Township of Lakewood, LTO, and LTRAP is one without a difference." (*Id.*) Even accepting plaintiffs' assertion, I find—as stated below—that plaintiffs' arguments of bias and arbitrary enforcement are better suited for summary judgment.

(ECF No. 30 p. 2.) Therefore, LTO meets §1437a(b)(6)(B)(ii)'s definition of a public housing agency.[3]

This would be a misreading, according to plaintiffs. Rather, the more reasonable interpretation of "includes" is permissive: what entities *may* be a public housing agency rather than what entities *are* or *must become* a public housing agency. (Pls.' Opp'n Br. p. 38.) For instance, plaintiffs read "a [public housing agency] *can* be a non-profit …" or "a [public housing agency] *can* be any one of the following …" into §1437a(b)(6)(B). (*Id.* (emphasis added).) Of course, such permissive language does not appear in §1437a(b)(6)(B) and plaintiffs cite to no basis for reading such language into the statute.

Rather, "includes" is an expansive term. *See Coyoy v. United States*, 526 F. Supp. 3d 30, 37 (D.N.J. 2021) ("Logically, 'including' is not a term of exclusion; it means the same thing as the cautious contract drafter's 'including but not limited to.'"). While courts do not necessarily read language proceeding "including" language as exhaustive, "[e]xhaustive or not, 'including' phrases list items that are *part of* the defined class." *Anderson v. Diamondback Inv. Grp., LLC*, 117 F.4th 165, 192 n. 4 (4th Cir. 2024) (Richardson, J., concurring). Plaintiffs prefer to read "includes" as "includable" by insisting that the §1437a(b)(6)(B) is most reasonably read with permissive, qualifying language such as "can." I disagree and find that the statute is most reasonably read by giving effect to Congress's decision to *not*

---

[3] This conclusion is consistent with those of state attorneys general. *See* La. Att'y Gen. Op. No. 17–0123 (Jan. 9, 2018), 2018 WL 547288, at *3 (noting that the Housing Act's definition of a "'public housing agency' is expanded to include three additional definitions for purposes of the Section 8 Program" including "any public or private nonprofit entity previously administering a program for tenant-based assistance upon the effective date of the Quality Housing and Work Responsibility Act of 1998"); Or. Att'y Gen. Op. No. OP–2011–2 (Oct. 5, 2011), 2011 WL 4945925, at *4 (finding that federal law could authorize entities to act as public housing agencies and that §1437a(b)(6)(B)(ii) is an example of such a law).

16

include qualifying language. *See United States v. Uriarte*, 975 F.3d 596, 604 (7th Cir. 2020) (interpreting Section 403 of the First Step Act of 2018 and concluding that Congress did not qualify the statute's terms "because it clearly applied to *all* defendants awaiting a valid sentence at the time of its enactment"); *see also Patterson v. Ga. Pac., LLC*, 38 F.4th 1336, 1347 (11th Cir. 2022) ("Because Congress did not qualify the word 'any,' it means 'all.'").[4]

Plaintiffs add as part of their argument that the Housing Act cannot be interpreted as granting the power to transform a private entity into a public agency against its will and "by fiat." (Pls.' Opp'n Br. p. 38.) This argument ignores LTO's own exercise of its will in choosing to maintain its contractual relationship with Lakewood, itself a public housing agency, for nearly 50 years. (ECF No. 30 p. 10.) I presume plaintiffs' familiarity with statutes and regulations applicable to LTO's administration of LTRAP, including § 1437a(b)(6)(B)(ii).[5] Designation as a public housing agency is associated with various obligations and requirements. *Hargrove*, 2019 WL 6712308, at *4. Among them are government access to internal books and records. *See* 24 C.F.R. § 982.158. Plaintiffs believe that LTO may avoid this sort of oversight

---

[4] This reading is based on the plain meaning of § 1437a(b)(6)(B)'s text. The parties do not direct me to any materials, such as legislative history, with which to further interpret Congress's intent. In any event, such materials would be unable to override the plain meaning of the statute. *See S.H. ex rel. Durrell v. Lower Merion Sch. Dist.*, 729 F.3d 248, 259 (3d Cir. 2013).

[5] Among HUD's motion exhibits is a June 19, 1996 letter written by LTO's counsel to HUD's Assistant Secretary for Public and Indian Housing. (ECF No. 204–16.) LTO's counsel asserted that LTO was an agency of Lakewood and sought a letter from HUD clarifying that LTO is a public housing agency. (*Id.* pp. 4, 5.) On July 9, 1996, the acting assistant secretary wrote to LTO's executive director stating that "LTO qualifies as a public housing agency" under the Housing Act. (ECF No. 204–22.) I do not rely on these correspondences in considering the pending motion. They do, however, exhibit LTO's understanding that whether it may be deemed a public housing agency could turn on its relationship with Lakewood.

by treating Lakewood as a sort of pass-through entity whereby Lakewood accepts the responsibility of administering LTRAP and associated funds from HUD and immediately transfers all of both to LTO whereafter HUD's typical oversight is extinguished. I am unpersuaded that such an arrangement is contemplated by the Housing Act.

I similarly find unavailing plaintiffs' position that LTO cannot be a public housing agency because it has not satisfied various regulatory requirements. (Pls.' Opp'n Br. p. 43; Pls.' Sur-Reply Br. p. 12.) These include the requirements that a public housing agency pass enabling legislation and contract with HUD. (*Id.*) Only Lakewood has contracted with HUD. (Pls.' Opp'n Br. p. 13.)

The regulations cited do not stand for the propositions asserted and are thus unhelpful to plaintiffs' case. For instance, plaintiffs cite 24 C.F.R. §982.51 for the proposition that a public housing agency must pass enabling legislation and submit the opinion of counsel to HUD. (Pls.' Sur-Reply Br. p. 12.) However, §982.51 refers to a public housing agency's provision of evidence to HUD that it may administer its program. 24 C.F.R. §982.51. The public housing agency applies to HUD for funding and, pursuant to §982.51, must submit evidence of its status and authority, including enabling legislation and a supporting legal opinion. 18 Barbara J. Van Arsdale, et al., *Federal Procedure: Lawyer's Edition* §44:416 (2025). It is unclear how §982.51 would be applicable to a public housing agency that administers a Section 8 program through a contract with another public housing agency that itself contracts with HUD. *See* 42 U.S.C. §1437a(b)(6)(B)(ii).

Similarly, plaintiffs contend, citing 24 C.F.R. §982.162, that a public housing agency must sign a contract with HUD. (Pls.' Sur-Reply Br. p. 12.) However, §982.162 refers to the use of HUD-required contracts and forms. *See Quillinan v. Papavassiliou*, Case No. 12–04159, 2013 WL 428604, at *1 n.3

18

(N.D. Cal. Feb. 1, 2013) (citing §982.162 and noting that the Housing Assistance Project contracts and portions of the lease were required to comport with HUD specifications); *Scott Realty Grp. Tr. v. Charland*, 159 N.E.3d 714, 717 (Mass. App. Ct. 2020) (same).[6]

Lastly, plaintiffs argue that HUD has never before attempted to apply 42 U.S.C. §1437a(b)(6) or 24 C.F.R. §982.4(b) in the manner asserted here and that HUD's present arguments represent a "flip-flop" from decades of prior understanding and practice. (Pls.' Sur-Reply Br. pp. 11–14.) However, these arguments—like plaintiffs' repeated allegations of bias—are not illuminative for the limited question presented by the motion: whether LTO is a public housing agency. The terms of 42 U.S.C. §1437a(b)(6)(B) are unambiguous and I do not defer to any interpretation made by HUD now or before. Thus plaintiffs' arguments that HUD has been arbitrary and selective in its application of §1437a(b)(6) may serve as a compelling basis for their motion for summary judgment. They are of little persuasive value here.

In sum, I find that LTO has administered the Section 8 program of Lakewood—itself a public housing agency—since 1977. It therefore meets the definition of a public housing agency under §1437a(b)(6)(B)(ii). Because I find that LTO meets the §1437a(b)(6)(B)(ii) definition of a public housing agency, I do not consider HUD's alternative arguments that LTO meets the definition under §1437a(b)(6)(A) or 24 C.F.R. §982.4(b).[7]

---

[6] Plaintiffs' opposition also refers to HUD's Handbook and the materials that must be submitted in order for an entity to become a public housing agency. (Pls.' Opp'n Br. p. 43.) Plaintiffs add an excerpt from the Handbook as an exhibit. (ECF No. 208–1 pp. 282–85.) HUD responds that the cited Handbook predates §1437a(b)(6)(B) and applies only to Section 9 public housing development proposals, not Section 8 vouchers. (HUD Reply Br. pp. 13, 14.) Plaintiffs do not refer to the Handbook in their sur-reply.

[7] In response, plaintiffs argue, for instance, that HUD's interpretation of 24 C.F.R. §982.4(b) is not entitled to deference. (Pls.' Opp'n Br. pp. 44–46.) Because my

## IV. CONCLUSION

For the foregoing reasons, HUD's motion at ECF No. 204 will be granted. An appropriate order accompanies this opinion.

                                                 */s/ Edward S. Kiel*
                                                 **EDWARD S. KIEL**
                                                 **UNITED STATES DISTRICT JUDGE**

Dated: January 22, 2026

---

decision rests on the statutory definition of "public housing agency," I need not consider plaintiffs' arguments related to the regulatory definition.